1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

**MICHELLE PEREZ-RODRIGUEZ,**

**Plaintiff,**

**v.**                                                                      CIVIL NO. 12-1287 (GAG)

**WYNDHAM VACATION OWNERSHIP,**

**et al.,**

**Defendants.**

## OPINION AND ORDER

Plaintiff Michelle Perez-Rodriguez ("Plaintiff") filed suit against Wyndham Vacation Ownership ("Wyndham") and Shawyn Maley ("Maley")[1] claiming she was sexually harassed and subjected to a hostile work environment on account of her sex, race, and national origin, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000*e et seq.* (See Docket No. 1.)  Plaintiff also invokes the court's supplemental jurisdiction, claiming violations of Puerto Rico Law 100 of June 30, 1959 ("Law 100"), P.R. LAWS ANN. tit. 29, §§ 146 *et seq*.; Law 115 of December 20, 1991 ("Law 115"), P.R. LAWS ANN. tit. 29, §§ 194a, *et seq*; Law 69, P.R. LAWS ANN. tit. 29, §1321;  Law 17,("Law 17"),  P.R. LAWS ANN. tit. 29, §§155 *et seq*; Article II, Section 1 of the Puerto Rico Constitution; and Articles 1802 and 1803 of the Civil Code of Puerto Rico ("Articles 1802 & 1803"), P.R. LAWS ANN. tit. 31, §§ 5141-5142.

Pending before the court is Wyndham's motion for summary judgment.  (Docket No. 30.) Plaintiff opposed the motion (Docket Nos. 40 & 41) and submitted a statement of additional facts (Docket No. 43). Wyndham replied (Docket No. 59).  After careful consideration of the parties' submissions and pertinent law, the court **GRANTS in part and DENIES in part** Wyndham's motion for summary judgment at Docket No. 30.

---

[1] Claims against co-defendant Maley were dismissed without prejudice. (Docket Nos. 62 & 63.)

Civil No. 12-1287 (GAG)

1    I.       Standard of Review

2            Summary judgment is appropriate when "the pleadings, depositions, answers to

3    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

4    genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

5    of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See FED. R. CIV. P. 56(a). "An issue

6    is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

7    'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson

8    v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

9    The moving party bears the initial burden of demonstrating the lack of evidence to support the non-

10   moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to

11   support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the

12   existence of at least one fact issue which is both genuine and material." Maldonado-Denis v.

13   Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is

14   genuinely in dispute by citing particular evidence in the record or showing that either the materials

15   cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse

16   party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  If the

17   court finds that some genuine factual issue remains, the resolution of which could affect the outcome

18   of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477

19   U.S. 242, 248 (1986).

20           When considering a motion for summary judgment, the court must view the evidence in the

21   light most favorable to the non-moving party and give that party the benefit of any and all reasonable

22   inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court does not make

23   credibility determinations or weigh the evidence.  Id.  Summary judgment may be appropriate,

24   however, if the non-moving party's case rests merely upon "conclusory allegations, improbable

25   inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21

26   (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

27

28                                              2

Civil No. 12-1287 (GAG)

## II.    Relevant Factual Background [2]

Wyndham provides vacation packages for locations throughout the United States. (See Docket No. 30-1 ¶ 1.) Wyndham has a number of regional offices and sale representatives. (See id.) As part of its development and marketing network, Wyndham operates a regional office at the Wyndham Rio Mar Beach Resort in Rio Grande, Puerto Rico. (See Docket No. 30-1 ¶¶ 1-2.) Wyndham's Human Resources Director, Lisette Lama ("Lama"), is stationed in Pompano Beach, Florida. (See Docket No. 30-1 ¶ 3.) When local support is needed, Kerania Olmo ("Olmo"), the Assistant Human Resources Director, assists Lama. (See Docket Nos. 30-1 ¶ 4.) Richard Wieczerzak ("Wieczerzak") is Wyndham's Vice President of Sales and Marketing for South Florida and Puerto Rico. He is stationed in Pompano Beach, Florida and oversees the Rio Grande office. ( Docket No. 30-1 ¶ 6.)

Plaintiff was born in Puerto Rico and is a self-identified Hispanic woman. (Docket No. 30-1 ¶¶ 9-10.) On March 23, 2010, Wyndham hired Plaintiff as a sales representative in the Rio Grande office. (Docket No. 30-1 ¶ 7.) When she began working, Plaintiff reported directly to Sales Manager Angelo Sanchez ("Sanchez"). On December 10, 2010, Wyndham hired Maley as a Sales Manager at the Rio Grande office. (Docket No. 30-1 ¶ 12.) As part of his initial employment orientation, Maley received training on company policies and employment related matters. (Docket No. 30-1 ¶¶ 13-14.) Upon Maley's arrival, Sanchez continued to directly supervise some of the Rio Grande sales representatives, including Plaintiff, while others were reassigned to Maley. (Docket No. 30-1 ¶ 15.) Sanchez subsequently went on FMLA leave and Maley became direct supervisor of all Rio Grande sales representatives, including Plaintiff. (Docket No. 30-1 ¶ 16.)

As part of its employment policies, Wyndham provides every sales representative with a copy

---

[2] Plaintiff's co-workers have also brought suit against Wyndham. See Civil Nos. Saliceti v. Wyndham, 2013 WL 5947140 (D.P.R. 2013), 12-1325 (GAG); Miles v. Wyndham, 2014 WL 287617 (D.P.R. 2014), 12-1288 (JAF); Planadeball v. Wyndham, 12-1485 (JAG); Sanchez v. Wyndham, 12-1911 (SEC). These cases have similar claims and all stem from the same conduct alleged against Wyndham employees. On various occasions, Plaintiff sets forth facts relevant to her co-workers' claims in order to support her own. Thus, the court will only consider those facts relevant to Plaintiff's claims and those that are supported by the record of this case.

Civil No. 12-1287 (GAG)

of the company's employee handbook, which includes a non-harassment policy that seeks to provide a harassment-free work environment. (Docket No. 30-1 ¶¶ 17-18.) The handbook also includes the procedure employees at Wyndham should follow to report harassment in the workplace. (Docket No. 30-1 ¶ 19.) Plaintiff claims she did not receive Wyndham's Employee Handbook until she complained about the discriminatory behavior that led to the filing of the case at bar. However, she admits having signed an acknowledgment of receipt for the employee handbook, at the commencement of her job. (Docket Nos. 30-1; 65-5 at 33-34.)

On April 29, 2011, Plaintiff approached Wieczerak to complain about Maley's behavior. (See Docket Nos. 30-1 ¶ 21; 65-5 at 37-38.) Specifically, Plaintiff told Wieczerak that her co-worker David Saliceti ("Saliceti") informed her of a comment he heard Maley say. Id. In front of other male employees, Maley said that he believed the perfect woman would be the combination of Plaintiff's ass and another female co-worker's breasts ("the perfect woman comment"). (Docket Nos. 30-1 ¶ 21; 30-13 ¶ 4; 65-5 at 38, L.L. 11-15 .) Plaintiff also told Wieczerak that Maley discriminated against Puerto Ricans and blacks. (Docket No. 65-5 at 38, L.L. 8-11.) The conversation between Wieczerak and Plaintiff was brief. Wieczerak went on to report the information to Lama, who agreed to take care of the investigation. (Docket Nos. 30-1 ¶ 22; 30-13 ¶ 7.) On May 2, 2011, Plaintiff met with Olmo. (Docket No. 30-1 ¶ 23.) Plaintiff, Olmo, and Lama had a phone conference to discuss Plaintiff's complaint. (Docket No. 30-1 ¶ 24.) After the meeting, Lama initiated an investigation. (Docket No. 30-3 ¶ 11.) Several Wyndham employees were interviewed and provided written statements, including Plaintiff, Maley, and Saliceti. (Docket Nos. 30-1 ¶ 25; 30-14) In accordance with company policy, Maley was suspended pending the results of the investigation. (Docket No. 30-1 ¶ 26.)

As part of the investigation, Plaintiff provided a written statement summarizing her complaints as follows:  (1) Saliceti told her that Maley had said the perfect woman comment; (2) Maley spoke badly about all the employees; (3) Maley said that he did not think Carmen Planadeball ("Planadeball"), another employee, was really sick until she had surgery; (4) Planadeball told

4

**Civil No. 12-1287 (GAG)**

Plaintiff that Maley asked an employee for Viagra and drugs; (5) Maley made humiliating comments regarding Frances Torres, another employee; (6) Maley said that he "hated" Sanchez; and (7) Maley made fun another employee's English. (Docket Nos. 30-1 ¶ 28; 30-14 at 9.)

Plaintiff claims Maley discriminated against her and her co-workers for being Puerto Rican. In her written statement, Plaintiff made no mention about Maley's negative comments about Puerto Ricans or African Americans, nor that he stared at her inappropriately. (Docket Nos. 30-1 ¶¶ 30-31; 30-14 at 9.)  However, in her deposition, Plaintiff mentioned comments Maley made degrading Puerto Ricans.  Specifically, Plaintiff stated that Maley would say all Puerto Ricans were poor and that they were only interested in gifts. (Docket No. 65-6 at 73, L.L. 3-15.)  Maley also constantly compared Puerto Ricans and blacks in a degrading manner.  Id.  Plaintiff heard Maley make fun of another employee's accent on multiple occasions. (Docket No. 65-6 at 66.)  Plaintiff's co-workers also testified that Maley made derogatory comments about blacks, Puerto Ricans, and females while at work.  (See generally Docket No. 43.)

Regarding Plaintiff's sexual discrimination claims, Plaintiff also states that Maley would constantly stare at her inappropriately.  (Docket No. 65-6 at 72, L.L 14-28; 56-57.)  Specifically Plaintiff points out, "[Maley] just keeps looking at you like he can eat you." (Id. at 57, L.L. 3-4.) In her deposition, Plaintiff identified what she believed was Maley's most inappropriate conduct. (Docket No. 65-5 at 75.)  The incident occurred when Plaintiff went to Maley to ask for permission to leave work for a doctor's appointment because she was suffering from constipation.  (Docket No. 65-6 at 69-70.)   Later on, Plaintiff found out that Maley had commented, in front of  male co-workers, that Plaintiff needed to find a man to have anal sex with to cure her constipation ("the anal sex comment").  Id.  Trying to prove that this incident wasn't as prejudicial as Plaintiff claims, Wyndham argues that Plaintiff failed to mention the anal sex comment in her written statement. (Docket No. 30-1 ¶ 32.)  Regardless, in her testimony, Plaintiff stated that she is uncertain whether the anal sex comment occurred before or after she had given her written statement.  She is inclined to believe the comment was made afterwards, which explains its omission from her written

1    statement. (Docket No. 65-8 at 71.)  Neither the perfect woman comment nor the anal sex comment

2    were heard by Plaintiff.  (Docket No. 30-1 ¶¶ 34-35.)

3          Throughout the entire investigation, Maley denied the harassment allegations. (Docket No.

4    30-1 ¶ 39.)  Wyndham was unable to substantiate the claims and decided to advise Maley on

5    company policy and work environment practices.  (Docket No. 30-1 ¶¶ 40-41.)  Maley traveled to

6    South Florida for a three-day business trip starting on May 24, 2011.  (Docket No. 30-1 ¶ 42.)  On

7    May 26, 2011, Plaintiff filed a report with the State Insurance Fund Corporation ("SIFC"), claiming

8    work-related injuries, and was placed on rest.  (Docket Nos. 30-1 ¶ 43; 30-15 & 30-16).  The next

9    day, Plaintiff filed sex, race, and national origin discrimination charges against Wyndham before the

10    Commonwealth's Anti-Discrimination Unit ("ADU").  (Docket Nos. 30-1 ¶ 44; 30-17.)  In her

11    complaint, Plaintiff  stated that the situation regarding Maley had worsened since she complained

12    to the Human Resources Department and claimed that the  discriminatory conduct is a continuing

13    act.  (Docket Nos. 30-1 ¶ 45 & 30-17.) Plaintiff's co-workers, Saliceti, Miles, and Planadeball had

14    all filed similar discrimination charges before the ADU and were receiving medical treatment before

15    the SIFC.  (Docket Nos. 30-1 ¶ 47; 30-3 ¶ 18.)  After receiving the ADU complaint, Lama contacted

16    Plaintiff to discuss the discrimination and the allegations contained in the complaint, but Plaintiff

17    told Lama she should contact her attorney.  (See Docket Nos. 30-1 ¶ 46 & 30-3 ¶ 19.)  After filing

18    the internal complaint, Plaintiff worked under Maley's supervision for a little over two weeks.

19    (Docket No. 30-1 ¶ 52.)

20          As a result of these allegations, Wiezcerak and Lama decided to transfer Maley out of Puerto

21    Rico to Pompano Beach, Florida.  (See Docket Nos. 30-1 ¶¶ 48-49; 30-3 ¶ 20.)  Maley left Puerto

22    Rico by July 1, 2011. (Docket Nos.  30-1 ¶ 50; 30-3 ¶ 21.)  Plaintiff resigned from her position on

23    September 24, 2011.  (Docket No. 30-1 ¶ 53 .)

24    **III.**    **Discussion**

25          Plaintiff's Title VII claims arise from allegations that she was subjected to a hostile work

26    environment on account of her sex, race, and national origin.  Plaintiff also claims retaliation under

27

28    

**Civil No. 12-1287 (GAG)**

Title VII and various local law claims.  The court addresses each claim seriatim.

      A.     Title VII Claims

      Title VII prohibits employers from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) .  See Vance v. Ball State Univ., 133 S. Ct. 2434, 2440 (2013).  In Meritor Savings Bank, FSB v. Vinson, the Supreme Court held the creation of a hostile work environment violated Title VII.  477 U.S. 57, 65-66 (1986) (stating "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.").  The statutory protection of Title VII includes the discrimination of a protected class that creates a hostile work environment.  Faragher v. Boca Raton, 524 U.S. 775, 787 (1998).

          **1.     Hostile work environment**

      Plaintiff claims that she was sexually harassed by Maley and subject to discrimination because of her race and national origin.[3]  (See Docket No. 1).  Plaintiff's unwelcome sexual harassment allegations surround three events: Maley's inappropriate looks and stares, the perfect woman comment, and the anal sex comment.  Pertaining to the national origin discrimination claims, Plaintiff alleges that Maley said : "You Puerto Ricans are dumb" and "there is no difference between a trash can and Puerto Rico," thereby creating a hostile work environment.  (See Docket No. 1 ¶¶ 7&9.)

      Sexual harassment constitutes sex discrimination prohibited by Title VII.  Gorski v. N.H. Dep't. of Corrections, 290 F.3d 466, 472 (1st Cir. 2002).  " Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual

---

[3] The court notes that Plaintiff attempts to allege a claim for racial discrimination but does not provide much detail in support. (Docket No. 1.) In her opposition, Plaintiff interchangeably alludes to discrimination based on race and national origin as if they were equal. (Docket No. 41.)  The court notes that these are separate protected classes, and should be treated as such.  See Cuello Suarez v. Puerto Rico Electric Power Authority, 789 F. Supp. 876, 891 (D.P.R. 1992).  The court understands that the racial discrimination claim in this case is completely unsupported. Therefore, the court focuses its analysis only on those properly supported claims.

Civil No. 12-1287 (GAG)

harassment."  29 C.F.R. § 1604.11 (2010).  Hostile work environment is a form of sexual harassment.  See Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006).  Title VII has been construed expansively to also protect against the creation of a work environment "heavily charged"  with racial or national origin discrimination.  See  Vance, 133 S. Ct. at 2440 (citing Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).  Claims based on the various protected classes are evaluated under similar standards.  Faragher, 524 U.S. at 65-66  (harmonizing framework between racial and sexual discrimination).

A hostile work environment claim under Title VII exists where a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993).  To have a valid Title VII hostile work environment claim, a plaintiff must demonstrate:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based upon [the protected class]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

See Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002));  Perez-Cordero, 656 F.3d at 27 (citing Agusty-Reyes v. Dep't. of Educ. of P.R., 601 F.3d 45, 52 (1st Cir. 2010) (discussing hostile work environment in sexual harassment case)).

When applying the six-part test, the court evaluates the claim "in light of the 'record as a whole' and mindful of 'the totality of the circumstances.'"  Perez-Cordero, 656 F.3d at 29 (quoting Meritor Savings Bank, 477 U.S. at 69).  The elements stated above, although highly persuasive, are not the only criteria used when determining the existence of a hostile work environment. The court considers several other factors.  See Valentin-Almeyda, 447 F.3d at 94.  As part of its "totality of the circumstance" analysis, the court weighs: its frequency, severity, whether it was physically

**Civil No. 12-1287 (GAG)**

threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance.  Id. (citing Harris, 510 U.S. at 23).

In cases where a plaintiff claims hostile work environment against more than one protected class, some courts have opted to analyze each protected class allegation separately.  See Harfford v. Seidner, 183 F.3d 506, 514 (6th Cir. 1999).  Notwithstanding,  the tendency is that most courts analyze the conduct as a whole.

> Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct. Such an approach defies the *Meritor* Court's directive to consider the totality of circumstances in each case and "rob[s] the incidents of their cumulative effect."  Moreover, such an approach not only ignores the reality that incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct. An employer might escape liability, even if it knew about certain conduct, if that conduct is isolated from a larger pattern of acts that, as a whole, would constitute an actionable hostile work environment.

O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (quoting Williams v. General Motors Corp., 187 F.3d 599, 561 (6th Cir. 1999)).  Mindful that the "totality of the circumstances" must be taken into consideration when analyzing the existence of a hostile work environment, the court will evaluate Plaintiff's three discrimination claims jointly.

Before challenging the elements of a hostile work environment claim, Wyndham alleges an absence of harassment.  (Docket No. 31 at 7.)   Wyndham further argues that, even assuming unwelcome harassment existed, Plaintiff fails to establish a *prima facie* case.  In support of its argument,  Wyndham contends that the record failed to show that: 1) the harassment was based on a protected class; 2) the behavior was severe and pervasive; 3) the objective and subjective offensiveness standard; and 4) employer liability.  Id.

The court analyzes the facts to determine whether the alleged harassment is actionable under Title VII.  The first element, is not challenged by the parties.  Plaintiff, a Puerto Rican woman, is member of both sex and national origin protected classes.

a)      Unwelcome harassment

9

Civil No. 12-1287 (GAG)

From the outset, Wyndham denies that any harassment took place.  In support of its argument, Wyndham contends that the alleged harassing behavior not witnessed directly by Plaintiff cannot be weighed as actionable harassment.[4]  (See Docket No. 31 at 7.)  Wyndham further argues that the behavior witnessed by Plaintiff, by itself, is insufficient to establish a *prima facie* case of hostile work environment.  Id.   This argument is unconvincing.  The mere fact that the alleged harassing conduct did not occur in Plaintiff's presence is not enough to bar harassment altogether.

To determine whether conduct is "unwelcome," it is permissible to examine the victim's actions.  "The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome."  Meritor, 477 U.S. at 68.  Throughout all its arguments, Wyndham clings to the fact that both the perfect woman comment and the anal sex comment were not made in Plaintiff's presence.  Although this fact is highly relevant to the case, Wyndham's argument also proves that Maley's behavior was in fact unwelcome by Plaintiff.

Both of Maley's comments regarding Plaintiff are unquestionably derogatory towards women.  Plaintiff and her female colleagues were subjected to embarrassment and ridicule behind their backs.  The fact that they became aware of these comments after they were made, when they were told by their male colleagues, makes the situation even worse.  In her testimony, Plaintiff stated

---

[4] Superficially, Wyndham also asserts that the comments Plaintiff heard "through the grapevine" are inadmissible hearsay and cannot be considered for summary judgment purposes.  (Docket No. 31 at 8-9.)  The court disagrees.  The First Circuit has interpreted the admissibility of hearsay in situations of alleged hostile work environment as follows:

> The insults and taunting that the plaintiff recounts do not create hearsay problems; those statements are not offered for their truth, but, rather, to show that the words were spoken (and, thus, contributed to the hostile work environment).  They are, therefore, admissible.  The statements made by supervisors are admissible as non-hearsay statements of the Wyndham's agents made within the scope of their employment.  See FED.R.EVID. R. 801(d)(2)(D).

Noviello v. City of Boston, 398 F.3d 76, 84-85 (1st Cir. 2005) (citing Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 526 n. 46 (5th Cir.2001)).  According to Rule 801 of the Rules of Evidence, Plaintiff's assertions do not constitute hearsay.  They are not offered to prove the truth of the statements asserted.  FED. R. EVID. R. 801.

**Civil No. 12-1287 (GAG)**

she felt embarrassed going to work after she found out about the anal sex comment.  (Docket No. 65-6 at 72, L.L. 14-18.)  Maley's constant staring made Plaintiff feel uncomfortable.  Id.  The court finds that without a doubt Maley's behavior was unwelcome by Plaintiff.

b)      Based on protected class

As to the third prong, most of Maley's comments were flooded with sexual connotation. Both the perfect woman comment and the anal sex comment directly allude to Plaintiff's physical attributes in a sexual manner.  He even mockingly commented about Plaintiff's health problems in a sexual manner.  "Behavior like fondling, come-ons, and lewd remarks is often the stuff of hostile environment claims, . . . . "  Billings v. Town of Grafton, 515 F. 3d 39, 49 (1st Cir. 2008) (quoting White v. N.H. Dep't of Corr., 221 F.3d 254, 260-61 (1st Cir. 2000) (commonplace 'sexual conversations and jokes,' including at the plaintiff's expense, coupled with disparate treatment)). "[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.") Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990)).  Both the perfect woman comment and the anal sex comment were gender-based and of a sexual nature.  Thus, the evidence set forth by Plaintiff is sufficient to create a genuine issue of material fact for a jury to determine whether Maley's behavior was motivated by Plaintiff's gender.

On the other hand, the record does not show that the complained behavior was motivated by Plaintiff's national origin.  The court does not question that Maley's behavior was derogatory towards Puerto Ricans.  However, Plaintiff does not provide evidence to demonstrate a connection between Maley's behavior and her membership in a protected class.  The evidence is insufficient to establish a genuine issue or material fact as to whether Maley's behavior was based on Plaintiff's national origin.  Aside from the fact that Plaintiff is Puerto Rican and witnessed Maley's comments, nothing shows that Maley's behavior alluded specifically to her national origin.  Maley's generic comments about Puerto Ricans standing alone do not constitute harassment based on Plaintiff's

**Civil No. 12-1287 (GAG)**

1  national origin.[5]

2            c)     Severe and pervasive standard[6]

3        The standards for judging hostility are sufficiently demanding "to ensure that Title VII does

4  not become a 'general civility code.'" Faragher, 524 U.S. at 788 (internal citations and quotations

5  omitted). "[Title VII] forbids only behavior so objectively offensive as to alter the 'conditions' of

6  the victim's employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).

7  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

8  environment–an environment that a reasonable person would find hostile or abusive–is beyond Title

9  VII's purview." Harris, 510 U.S. at 21.

10        The First Circuit has explained that finding hostile work environment "does not depend on

11  any particular kind of conduct" and "that [t]here is no precise formula for establishing sufficiently

12  egregious conditions." Perez-Cordero, 656 F.3d at 29. The severe or pervasive inquiry is highly

13  fact-specific. Molina-Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp. 2d 108, 112

14  (D.P.R. 2002) (citing Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001)). A court must

15  look at the "totality of the circumstances, including 'the frequency of the discriminatory conduct;

16  its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

17  whether it unreasonably interferes with an employee's work performance.'" Valentin-Almeyda, 447

18  F.3d at 94. The Supreme Court has clarified that "conduct must be extreme to amount to a change

19  in the terms and conditions of employment." Harris, 510 U.S. at 21. "[T]he law does not address

20

21

22      [5] This court has already entertained a hostile work environment claim based on national origin that arose

23  from the same set of facts. In Saliceti v. Wyndham, 2013 WL5947140 (D.P.R. 2013) Plaintiff's co-worker, Saliceti also filed suit against Wyndham and Maley claiming hostile work environment on account of race and

24  national origin. The court granted summary judgment, dismissing Plaintiff's national origin claim because it found that Plaintiff did not establish its prima facie case. Specifically, it found that the complained behavior did not

25  amount to severe and pervasive harassment proscribed by Title VII. Saliceti,2013WL5947140 at 9.

26

27      [6] The court turns to discuss both the fifth and sixth prongs of the hostile work environment analysis together since its analysis is intertwined.

28                           12

**Civil No. 12-1287 (GAG)**

1   every discomfort and offense suffered in the workplace." Faragher, 524 U.S. at 883.  "[Title VII]

2   is not designed to purge the workplace of vulgarity."  Baskerville v. Culligan Intern Co., 50 F. 3d

3   428, 430 (7th Cir. 1995).

4           As pointed out above, Plaintiff did not witness the perfect woman comment or the anal sex

5   comment.  The only alleged, sexually harassing behavior Plaintiff *directly* experienced was Maley's

6   inappropriate looks.  In her testimony, Plaintiff affirms "[Maley] just keeps looking at you like he

7   can eat you."  (Docket No. 65-6 at 57, L.L. 3-4.)  The rest of the inappropriate behavior, directly

8   concerns Plaintiff, but was not witnessed by her.  She found out about Maley's comments "though

9   the grapevine."  Saliceti witnessed the comments first-hand and then told Plaintiff.   "Through the

10  grapevine" harassment is the complained behavior directly regarding plaintiff, not witnessed by her,

11  but instead witnessed by one of her peers.  See Savino v. C.P. Hall Co., 199 F.3d 925, 933 (7th Cir.

12  1999). The Seventh Circuit has found that a plaintiff that heard "through the grapevine" that her

13  supervisor once or twice referred to her in a derogatory manner is not, by itself, actionable sexual

14  harassment. Id. (citing Faragher, 118 S.Ct. at 2283).  Savino treated the harassment heard "through

15  the grapevine" as second-hand harassment.  199 F.3d at 933.  Second-hand harassment is the

16  allegedly harassing behavior of other employees, not directed at a plaintiff.  The court found that this

17  behavior is relevant, "but less objectionable than harassment directed at the plaintiff."  Moser v.

18  Indiana Dept. of Corrections, 406 F.3d 895, 903 (7th Cir. 2005).

19          The same applies to Maley's alleged discriminatory comments on Plaintiff's national origin.

20  Plaintiff states that Maley often made fun of another employee's accent. (Docket No. 65-5 at 68.)

21  Although extremely rude, mocking a person's accent is not the type of behavior proscribed by Title

22  VII.  Even less when Plaintiff is not the one who was mocked.  Plaintiff claims to have witnessed,

23  on  three or four occasions, Maley say that all Puerto Ricans are poor and that they are always trying

24  to get things for free.  (Docket No. 65-6 at 75.)  Maley also compared Puerto Ricans to blacks in a

25  derogatory manner and said that all Puerto Ricans use drugs.  Id.  The latter comment was never

26  heard by Plaintiff.  The other alleged discriminatory comments based on Plaintiff's national origin

27

28                                                      13

**Civil No. 12-1287 (GAG)**

1    constitute generally offensive comments, but none were targeted at any employee in particular.  In

2    fact, the only link between Plaintiff and Maley's behavior was the fact that she was in the same

3    room.  See Saliceti, 2013 WL 5947140 at 13.

4         Although the comments are uncontested, the context in which they were made is key to the

5    court's analysis.  In Valentin-Almeyda, the First Circuit established that, when analyzing the totality

6    of the circumstances, courts should to take into consideration the context in which the alleged

7    harassing conduct took place, among other factors.  447 F.3d at 94.  Maley's comments do not pose

8    the same threat as if addressed *directly* to Plaintiff.  The court is mindful that the First Circuit has

9    not discussed "through the grapevine" harassment and its effect on hostile work environment claims.

10    Without such guidance, Maley's indirect complained behavior cannot be completely disregarded

11   just because it was not directly witnessed by Plaintiff.  Certainly, indirect behavior is relevant to the

12   existence of a hostile work environment.  Although, by themselves, those indirect incidents may be

13   insufficient to constitute severe and pervasive behavior, the totality of the circumstance may suggest

14   otherwise.   "The workplace is not a cocoon, and those who labor in it are expected to have

15   reasonably thick skins.'"  Marrero, 304 F.3d at 19 (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49,

16   54 (1st Cir. 2000)). Offhand remarks, simple teasing, tepid jokes, and isolated incidents are at the

17   commonplace indignities end of the continuum.  This type of behavior, standing alone, usually does

18   not amount to a hostile work environment.  Severe or pervasive discriminatory remarks, ridicule,

19   and intimidation fall at the other end of the continuum and may support a jury verdict finding a

20   hostile work environment.  Noviello, 398 F.3d at 92; Marrero, 304 F.3d at 19.

21        Without a doubt, Maley's behavior was rude, unprofessional, derogatory, and insulting.  Any

22   reasonable person in Plaintiff's position would have felt uncomfortable.  In Rosario v. Dept. of

23   Army, 607 F.3d. 241, 248 (1st Cir. 2010), the First Circuit found that a plaintiff met her prima facie

24   case of hostile work environment even though she had alleged a varied array of dispersed

25   complained behavior.  Relying on Faragher, the court found that the added mixture of incidents and

26   comments could lead a reasonable jury to find the existence of a hostile work environment.  607

27

28                                                14

**Civil No. 12-1287 (GAG)**

F.3d. at 249.

> 'We thus conclude that Rosario adduced sufficient evidence for a jury to find that she was subjected to conduct that was 'so severe or pervasive that it altered the terms or conditions of her employment.' The behaviors she alleges go well beyond 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' She presented evidence of longstanding harassment that interfered with her work on a daily basis and ultimately caused harm to her emotional stability and health.

Rosario, 607 F.3d. at 249 (quoting Pomales, 447 F.3d at 83; Faragher, 524 U.S. at 788).

According to Plaintiff, Maley's inappropriate staring occurred around three to five times. (Docket No. 65-6 at 57 L.L. 18-21.) The comments regarding Puerto Ricans occurred around three or four times. Id. at 73. It is very likely that Maley's conduct created an uncomfortable atmosphere. Maley's sporadic inappropriate looks, in conjunction with the comments about Puerto Ricans, and those Plaintiff heard "through the grapevine," is sufficient for a reasonable jury to find that Plaintiff's work conditions had been altered.

The court finds no difference between Rosario and the case at bar. Maley's complained behavior varies from casual minimal incidents to completely rude, degrading, disrespectful behavior. A reasonable jury could find it was completely unacceptable workplace behavior. A jury, and not the undersigned, should thus, make the determination as to whether or not Plaintiff was submitted to a hostile work environment on account of her sex, as proscribed by Title VII.

d)    Employer Liability

To hold Wyndham liable for Maley's behavior, Plaintiff must demonstrate some basis for employer liability. The standard is higher than when the alleged harasser is a supervisor. "When it is a supervisor that creates an actionable hostile work environment, the employer is vicariously liable." Gerald v. Univ. of P.R., 707 F.3d 7, 19-20 (1st Cir. 2013) (citing Arrieta-Colon v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 86 (1st Cir. 2006)).

Maley was Plaintiff's supervisor, therefore Wyndham could be held liable. The record shows that Plaintiff has demonstrated employer liability and established a prima facie case of hostile work environment for which Wyndham could ultimately be held responsible.

Civil No. 12-1287 (GAG)

Thus, the court finds that Plaintiff has met her burden of proof and successfully established a *prima facie* case of hostile work environment.  Accordingly, the court **DENIES** Wyndham's summary judgment as to Plaintiff's hostile work environment claims under Title VII.

### B.    Constructive Discharge

Plaintiff contends that the alleged hostile work environment led to her constructive discharge. (Docket No. 1.)  In order to substantiate a constructive discharge claim, a Plaintiff must show "working conditions so [became] intolerable that a reasonable person would have felt compelled to resign." Gerald, 707 F.3d. at 25 (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 147). To survive summary judgment, record evidence must show that such conditions existed.  The standard is both subjective and objective, it does not reside solely on Plaintiff's subjective beliefs. Roman v. Potter, 604 F.3d. 34, 42 (1st Cir. 2010).

Plaintiff's constructive discharge argument does not evolve past the complaint stage. Nothing on the record points to show that Plaintiff's work conditions were so intolerable that she felt obligated to resign.  In fact, the record is completely devoid of any fact that points to show that Plaintiff had no other option but resign.  After filing her complaint, Plaintiff went on sick leave, as mandated by the SIFC.  (Docket Nos. 30-1 ¶ 43; 30-15; 30-16.) During that time that Wyndham transferred Maley out of Puerto Rico.  Upon her return to work, Maley was not longer an employee at Wyndham's Rio Grande offices. (Docket No. 30-1 ¶¶ 48-49.) Without Maley's presence, Plaintiff has failed to show how her work conditions continued to be intolerable. Such evidence is insufficient to substantiate Plaintiff's constructive discharge claim.

### C.    Faragher-Ellerth Defense

The Faragher-Ellerth defense was designed to protect only those responsible employers who have established effective sexual harassment policies and responsive grievance processes. Agusty-Reyes, 601 F.3d. at 55. The applicability of the Faragher-Ellerth defense relies upon whether Plaintiff suffered a tangible employment action.  See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. "This affirmative defense . . . requires a defendant employer to show both  (1) 'that its own

**Civil No. 12-1287 (GAG)**

1   actions to prevent and correct harassment were reasonable' and (2) 'that the employee's actions in

2   seeking to avoid harm were not reasonable.'" <u>Agusty-Reyes</u> at 53.  The affirmative defense is

3   available even if the complained behavior did not result in a tangible employment action.  <u>Id.</u>

4          In accordance with the court's analysis of Plaintiff's Title VII claims, a genuine issue of

5   material fact exists as to whether or not the Faragher-Ellerth test is met here.

6          D.     <u>Retaliation</u>

7          Title VII makes it unlawful for an employer to retaliate against a person who complains

8   about discriminatory employment practices.  <u>See</u> 42 U.S.C. § 2000e-3(a).  Title VII's anti-retaliation

9   provision differs from its substantive provision in that the latter seeks to prevent injury to individuals

10  based on who they are, while anti-retaliation seeks to prevent harm to individuals based on their

11  actions.  <u>DeCaire v. Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008) (citations omitted) (internal quotation

12  marks omitted).  In order to advance a retaliation claim, Plaintiff  "must show by a preponderance

13  of the evidence that: (1) engaged in protected conduct under Title VII; (2) experienced an adverse

14  employment action; and (3) a causal connection exists between the protected conduct and the

15  adverse action."  <u>Wyatt v. City of Boston</u>, 35 F.3d 13, 15 (1st Cir. 1994).  "The relevant question

16  is whether [the employer] was retaliating against [the plaintiff] for filing a complaint, not whether

17  he was motivated by gender bias at the time."  <u>DeCaire</u>, 530 F.3d at 19.  Accordingly, for the

18  purpose of a retaliation claim, the "'relevant conduct is that which occurred *after* the [plaintiff]

19  complained about his superior's [discriminatory]'" acts.  <u>Acosta v. Harbour Holdings & Operations</u>,

20  674 F. Supp. 2d 351, 365 (D.P.R. 2009) (quoting <u>Henderson</u>, 439 F.3d at 8.).

21         "Examples of adverse employment actions in the retaliation context include termination of

22  employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

23  material loss of benefits, significantly diminished material responsibilities, or other indices that

24  might be unique to a particular situation."  <u>Morales-Vallellanes v. Potter</u>, 605 F.3d. 27, 36 (1st Cir.

25  2010) (internal quotations omitted) .  <u>See</u> <u>also</u> <u>Broderick v. Donaldson</u>, 437 F.3d 1226, 1232

26  (D.C.Cir.2006) ("In the absence of a finding that the plaintiff has suffered adverse action, a

27

28                                      17

**Civil No. 12-1287 (GAG)**

1   retaliation claim fails as a matter of law.").  "Minor disruptions in the workplace, including 'petty

2   slights, minor annoyances, and simple lack of good manners,' fail to qualify."  Id. (quoting

3   Burlington Northern, 548 U.S. at 68).

4         It is uncontested that Plaintiff engaged in protected activity under Title VII.[7]  However, the

5   court is not convinced whether Plaintiff in fact suffered an adverse employment action as a result.

6   Plaintiff claims to have been retaliated against after engaging in protected activity because the

7   alleged hostile environment conditions worsened. (See Docket No. 1 ¶ 8.)  Specifically, Plaintiff

8   points to the anal sex comment incident as proof that the harassing behavior escalated.  Plaintiff also

9   alleges constructive discharge. (See Docket No. 1.)  However, she provides no evidence in support

10  of this claim.  There is no evidence that points to the fact that Plaintiff had no other option but to

11  resign her job. Plaintiff's allegation of constructive discharge does not hold water.

12        The third prong of Title VII's anti-retaliation provision was recently interpreted and further

13  defined by the Supreme Court. "Title VII retaliation claims must be proved according to traditional

14  principles of but-for causation, . . . . This requires proof that the unlawful retaliation would not have

15  occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Texas

16  Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 2533 (2014) (emphasis added).

17        In addition, the record clearly shows that Plaintiff is uncertain when the anal sex comment

18  occurred.  (Docket No. 65-6 at 71, L.L. 5-28.)  As stated, for retaliation purposes, relevant conduct

19  must have taken place *after* a plaintiff engaged in protected activity.  Acosta, 674 F. Supp. 2d at 365.

20  Aside from the anal sex comment, Plaintiff provided no other examples of an exacerbated hostile

21  environment.  Even if the court were to infer, in Plaintiff's favor, that the anal sex comment took

22  place after she engaged in protected activity, the evidence does not satisfy the *but-for* standard

23  recently espoused in Nassar.  Plaintiff failed to meet the second and third elements to support its

24  retaliation claim.  The court finds that Plaintiff has failed to demonstrate a *prima facie* case of

25  ────────────────

26        [7] Plaintiff first complained to her supervisor on April 29, 2011 and later on filed a formal complaint,

27  accompanied by a written statement. (See Docket No. 30-14.)

28                                              18

**Civil No. 12-1287 (GAG)**

1   retaliation under Title VII.

2       Thus, the court **GRANTS** Wyndham's motion for summary judgment, **DISMISSING**

3   Plaintiff's retaliation claims**.**  (Docket No. 30.)

4       E.      Supplemental Claims

5       Plaintiff  asserts several causes of action under Law 100, Law 69, Law 17, and Law 115.

6   Wyndham seeks the dismissal of Plaintiff's state law claims by referencing all arguments against

7   Plaintiff's Title VII claims. (Docket No. 31 at 24.)

8           **1)      Claims under Laws 100, 69, 17 & 115**

9       Law 100 and Law 69 prohibit employment discrimination on account of gender. "Puerto

10  Rico's Law 100 is a broad antidiscrimination statute analogous to Title VII in many respects."

11  Perez-Cordero, 656 F.3d. at 26 n.10.  Furthermore, "Puerto Rico's Law 17, which is to be interpreted

12  *in pari materia* with Law 100 and merely identifies with greater specificity conduct that Law 100

13  already prohibits." Id. (citing Matos Ortiz v. Puerto Rico, 10 F. Supp 2d, 59, 64-65 (D.P.R. 2000)).

14  See  Vargas v. Fuller Brush Co., 336 F. Supp. 2d 134, 142 (D.P.R. 2004)  (stating that Law 17 and

15  Law 69 represent more specific prohibitions of what is already prohibited by Law 100 and that all

16  three statutes form a single legislative scheme to create a public policy against sex discrimination);

17  Levine–Diaz v. Humana Health Care, No. 10-2090, 2014 WL 26270,*19 (D.P.R. 2014);  Gerald,

18  707 F.3d at 26-27.

19      Likewise, Puerto Rico's Law 115, the local anti-retaliation statute, closely mirrors Title VII's

20  anti-retaliation provision.  Law 115 requires Plaintiff to demonstrate that she: "(1) participated in

21  an activity protected by §§ 194 *et seq.,* and; (2) was subsequently discharged or otherwise

22  discriminated against."  Collazo v. Bristol-Myers Squibb Inc., 617 F.3d 39, 45 (1st Cir. 2010)

23  (internal quotations omitted). In this case, the court concluded that Plaintiff failed to present

24  sufficient evidence to establish a prima facie case of retaliation under Title VII.  Law 17 also protects

25  employees against retaliatory actions taken by an employer due to an employee's participation in the

26  lodging or investigation of a sexual harassment complaint. See P.R. Laws Ann. tit. 29, § 155h;

27

28                                           19

**Civil No. 12-1287 (GAG)**

1    Matos Ortiz v. Puerto Rico, 103 F. Supp. 2d 59, 63 (D.P.R. 2000) (citing Law 17 supports sexual

2    harassment and retaliation claims).   Accordingly, Plaintiff's Law 17 retaliation claim does not

3    survive summary judgment.   Therefore, this claim is summarily dismissed on the same grounds as

4    Plaintiff's Title VII retaliation claim, the court **GRANTS** the Defendant's Motion for Summary

5    Judgment as to Plaintiff's Law 17 retaliation claim.

6         Accordingly, the court **DENIES** Wyndham's motion for summary judgment as to Plaintiff's

7    claims under Puerto Rico Laws 100, 69 and 17 on the same grounds as Plaintiff's Title VII claims

8    and **GRANTS** Wyndham's motion for summary judgment as to Plaintiff's retaliation claims under

9    Law 115 and Law 17.

10         **2)   Claims under Articles 1802 & 1803 of the Puerto Rico Civil Code**

11         In addition, Plaintiff states a cause of action pursuant to Articles 1802 & 1803 of the Puerto

12   Rico Civil Code.   These claims are based on the same facts that give rise to Plaintiff's causes of

13   action under Puerto Rico's special employment statutes discussed above.   The  Puerto Rico Supreme

14   Court has already stated that Laws 100, 17, 69 & 115 supersede the claims under Articles 1802 &

15   1803.

16              [T]o the extent that a specific labor law covers the conduct for which
                a plaintiff seeks damages, he is barred from using that same conduct
17              to also bring a claim under Article 1802.  An additional claim under
                Article 1802 may only be brought by the employee-plaintiff if it is
18              based on tortious or negligent conduct distinct from that covered by
                the specific labor law(s) invoked.
19

20   Santini Rivera v. Serv. Air, Inc., 137 P.R. Dec. 1; 1994 P.R. Offic. Trans. 527. This is not a novel

21   issue before the court.   See also  Reyes-Ortiz v. McConnell Valdes, 714 F.Supp. 234, 239 (D.P.R.

22   2010); Medina v. Adecco, 561 F.Supp.2d 162, 174 (D.P.R. 2008).

23         Plaintiff bases her Article 1802 & 1803 claims on the same conduct that supports the claims

24   under the local employment statutes, and no independent tortious conduct is alleged.   Accordingly,

25   the court **DISMISSES** Plaintiff's claims under Articles 1802 & 1803 of the Puerto Rico Civil Code.

26   As such, the court **GRANTS** Wyndham's motion for summary judgment dismissing Plaintiff's state

27   law claims under Articles 1802 & 1803 of the Puerto Rico Civil Code.

28                                       20

Civil No. 12-1287 (GAG)

**IV.     Conclusion**

For the foregoing reasons, the court **GRANTS in part and DENIES in part** Wyndham's motion for summary judgment at Docket No. 30.

**SO ORDERED**

In San Juan, Puerto Rico this 19th day of February, 2014.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge